UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AMERICAN PETROLEUM INSTITUTE, | * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 23-cv-10498-ADB |
| YATCO ENERGY LLC, YATCO DISTRIBUTION, LLC, YATCO LUBRICANTS, LLC, AMERICAN PREMIUM LUBRICANTS, LLC, QUESTRON PACKAGING, LLC, AMERICA PETRO, LLC, NABIL BARADA, MAHA BARADA, OUSSAMA DABAJA, AHMAD ABADI, ALI TARHINI, and JOHN DOES 1-10, | * * * * * * * * * * * * | |
| Defendants. | * * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff American Petroleum Institute ("Plaintiff" or "API") alleges that by selling a

substandard oil labeled with counterfeit marks Defendants Yatco Energy LLC ("Yatco Energy"),

Yatco Distribution LLC ("Yatco Distribution"), Yatco Lubricants LLC ("Yatco Lubricants")

(collectively, the "Yatco Defendants") are, among others, liable for trademark counterfeiting and

trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114(1)(a),1116(d), and for unfair

competition under Massachusetts law, Mass. Gen. Laws ch. 93A. [ECF No. 1 ("Complaint" or

"Compl.")]. Presently before the Court are Yatco Energy and Yatco Distribution's (the "Yatco

Movants") motion for summary judgment, [ECF No. 67], and API's cross-motion for summary

judgment against Yatco Distribution and Yatco Lubricants, [ECF No. 70]. For the reasons stated herein, both motions are **DENIED**.

## I.    BACKGROUND

Prior to its discussion of the relevant facts, the Court notes that out of the three Yatco Defendants only Yatco Distribution and Yatco Energy move for summary judgment, and that API's cross-motion is directed solely at Yatco Distribution and Yatco Lubricants. [ECF Nos. 67, 70].

### A.    Material Facts[1]

API is an industry association for the petroleum and natural gas industry, and it uses its corporate trademarks and names, AMERICAN PETROLEUM INSTITUTE and API, together with certification marks, for a range of products, services, and programs. [ECF No. 5-1 ¶¶ 3, 8].

_____

[1] As a threshold matter, the Court notes that although API responded to the Yatco Movants' statement of material facts, [ECF No. 74 ("SOF")], it did not submit its own statement of material facts in connection with its motion for summary judgment as required by Local Rule 56.1. API instead included a fact section in its memorandum in support of the motion. This does not satisfy Local Rule 56.1. L.R. 56.1 ("Motions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation."); see also Martin v. Tricam Indus., Inc., 379 F. Supp. 3d 105, 108 n.1 (D. Mass. 2019) (fact section in memorandum insufficient to comply with L.R. 56.1). As such, it is well within the discretion of the Court to deny API's summary judgment motion. L.R. 56.1 ("Failure to include . . . a [concise] statement [of the material facts of record] constitutes grounds for denial of the motion."); see also Zimmerman v. Puccio, 613 F.3d 60, 63 (1st Cir. 2010) (emphasizing the importance of Local Rule 56.1 "in preventing litigants from shifting the burden of organizing evidence to the district court" and noting that the court of appeals "treat[s] the district court's decision to apply [the local rule] with deference" (quoting Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 31 (1st Cir.2010))); Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007) ("Given the vital purpose that [Rule 56] serve[s], litigants ignore [it] at their peril."). Nonetheless, because API included record cites in its fact section, the Court will overlook API's failure to comply with Rule 56.1. The Court thus draws its facts from the parties' combined Rule 56.1 statement of material facts, [SOF], documents referenced therein, and the record.

As relevant here, API operates a licensing and certification program for engine oil standards for passenger vehicles called API 1509, Engine Oil Licensing and Certification System ("EOLCS"), which authorizes engine oil manufacturers to use API's federally registered certification marks ("API Certification Marks") if the manufacturers meet specified performance requirements.  [Id. ¶¶ 3, 5, 10–12]; see, e.g., [ECF No. 1-2 (the federally registered API Certification Mark "Starburst", Reg. No. 1,864,428 (the "API Starburst Mark"))]; [ECF No. 1-3 (the federally registered API Certification Mark "Donut," Reg. Nos. 1,872,999 and 1,868,779 (the "API Donut Marks"))].  The engine oils that meet certain standards may also be identified by a performance standard designation called the API Service Category designation, demarked as "S_".[2]  [ECF No. 5-1 ¶ 6].



The API Starburst Mark



The API Donut Marks

---

[2] The second letter of the "S_" designation has progressed alphabetically over time to reflect advances in engine technology, [ECF No. 5-1 ¶ 6], and the relevant API Service Category at issue here is "SN," see [ECF No. 71-1 ¶ 5].

3

Defendants Yatco Distribution, Yatco Lubricants, and Yatco Energy are three related companies, [SOF ¶ 7], set up by three brothers, Tarek Yatim, Hassan Yatim, and Khalil Yatim, see [ECF Nos. 75-4, 75-5, 75-3]; see also [ECF No. 71-3 at 11:21–12:11].[3]  API alleges that the Yatco Defendants sold counterfeit motor oil products at various Yatco-branded gas/convenience stores and marketed them online.  [Compl. ¶¶ 48, 78–80].  As relevant here, the parties dispute (i) which Yatco Defendants procured the counterfeit oil products, with Defendants asserting it was only Yatco Lubricants and API contending it was also Yatco Distribution, [SOF ¶¶ 14, 23–24]; (ii) the relationship between the approximately fifteen Yatco-branded gas/convenience stores, which are not parties to the litigation, and the Yatco Defendants,[4] [id. ¶¶ 16–18], and (iii) which Yatco Defendant advertised the counterfeit products online, [id. ¶ 9].  What is undisputed, however, is that, from 2017 until the end of 2018, one Yatco entity, Yatco Lubricants, purchased motor oil bearing the unauthorized API Certification Marks ("Counterfeit Products") from the engine oil manufacturer Questron Packing, LLC ("Questron").  [Id. ¶¶ 23, 25, 28]; [ECF No. 71-1 ¶¶ 4–5]; [ECF No. 71-3 at 43:10–21].  Invoices issued by Questron during that time period

---

[3] Yatco Distribution was formed on February 23, 2012, with the purpose of "[e]ngag[ing] in the business of buying, selling and distribut[ing] . . . gasoline, diesel, petroleum products, and other fuels" and any related business.  [ECF No. 75-4 at 2, 3].  Yatco Lubricants was formed on March 10, 2017, also with the purpose of "[e]ngag[ing] in the business of buying, selling and distribut[ing] . . . gasoline, diesel, petroleum products, and other fuels" and any related business, and was "administratively cancelled" on February 3, 2021.  [SOF ¶ 34; ECF No. 75-5 at 2, 3].  Yatco Energy provides "accounting and management services to motor fuel and convenience store entities," and was formed on January 3, 2022.  [ECF No. 75-3 at 2, 3].

[4] API does not dispute that there are approximately fifteen Yatco-branded gas/convenience stores but notes that it never received any documents from the Yatco Defendants to verify this assertion.  [SOF ¶ 17].

stated that its motor oil "Meets API Specification."[5]  [SOF ¶ 26]; [ECF No. 69-7].  It is also

undisputed that yatcoenergy.com marketed Questron products, though the precise time period is

unclear.[6]  [ECF No. 71-3 at 23:11–15].

 

Questron product affixed with the unauthorized API Starburst Mark and "SN" designation

The record further shows that Yatco Lubricants resold the Questron Counterfeit Products

to a distributor called J. Polep.[7]  [SOF ¶¶ 15, 24]; see also [ECF No. 71-3 at 19:22–20:3; 27:2–

28:5].[8]  While the Yatco Defendants maintain that J. Polep resold the Questron Counterfeit

---

[5] Although the SOF states that the invoices included "Meets API Certifications," [SOF ¶ 26], the invoices used the phrase "Meets API Specification," [ECF No. 69-7].  For purposes of this order, however, that discrepancy is immaterial, and the Court accordingly ignores it.

[6] As noted infra, API maintains that the Yatco Defendants advertised the Counterfeit Products as late as July 2022.  [ECF No. 73-4 ("July 2022 Letter") at 1].

[7] API asserts, and the Yatco Defendants dispute, that Yatco Distribution also purchased motor oil from Questron and then sold it to J. Polep.  [SOF ¶¶ 23–24]; [ECF No. 68 at 10].

[8] The record indicates that Questron at some point supplied oil products that did not carry an API certification mark, see [ECF No. 71-3 at 38:8–39:12], and that, on J. Polep's request, Yatco Lubricants communicated to Questron that the oil needed to meet API specifications, [ECF No. 71-2 at 57:14–58:1]; [ECF No. 71-3 at 37:9–39:7].

Products directly to the Yatco-branded gas/convenience stores, API claims that Yatco Lubricants and Yatco Distribution repurchased the Counterfeit Products from J. Polep to distribute and resell at the Yatco-branded stores.  Compare [ECF No. 68 at 10], and [ECF No. 73 at 2–4], with [ECF No. 71 at 12].

On February 1, 2019, API informed J. Polep that Questron's engine oil "falsely claims to meet API's engine oil standards," [ECF No. 69-8 at 2–5 ("February 2019 Letter")], and that API had "tested multiple samples of [the] oil and every sample critically failed basic oil performance tests," [id. at 2].  API demanded that J. Polep "immediately stop selling [the] oil."  [Id.].  On February 4, 2019, J. Polep forwarded the February 2019 Letter to Hassan Yatim.  [ECF No. 69-8 at 1]; see [ECF No. 71-2 at 31:23–32:10].  The parties dispute, and the record is unclear about, the extent of the effort to remove Questron Counterfeit Products from Yatco-branded gas/convenience stores.  [SOF ¶ 31]; see [ECF No. 71-2 at 33:16–21 (Hassan Yatim testifying that "we decided to remove all the [Questron] products from the shelf and stop selling it"), 34:4–5 (stating that after the February 2019 Letter, Questron's engine oil was "never sold . . . anymore in the stores")].  But see [ECF No. 71-3 at 47:2–7 (Tarek Yatim testifying that he was not aware of any actions taken by Yatco entities to ensure that Questron's engine oil was no longer sold), 57:19–21 (stating that it was possible that Questron oil from 2018 was still on the shelves of Yatco-branded stores in 2022)].  On May 11, 2022, API located Questron Counterfeit Products at a Yatco-branded store.  [ECF No. 71-6 at 3–5 (pictures taken on May 11, 2022, of Questron Counterfeit Products at a Yatco-branded store)].

On July 28, 2022, API's counsel contacted Yatco Energy, stating that API "has received evidence that Yatco has marketed multiple brands of engine oils on the Yatco website and in Yatco convenience stores with counterfeit API certification marks," including Questron

Counterfeit Products and other allegedly infringing brands such as MAXXRPM, Global 1, and U.S. Oil.  [ECF No. 73-4 ("July 2022 Letter") at 1–2]; see also [ECF No. 71-6].  API demanded that Yatco Energy "[c]ease all sales and distribution of any . . . Counterfeit products bearing the API Starburst and/or API Donut Marks, as well as the API corporate trademark, or any marks confusingly similar to such marks."  [July 2022 Letter at 2].

### B.    Procedural History

On March 3, 2022, API filed a complaint against the Yatco Defendants and several other defendants,[9] alleging various violations of the Lanham Act, including trademark counterfeiting, 15 U.S.C. §§ 1114(1)(a),1116(d) (Count I), trademark infringement, 15 U.S.C. § 1114(1)(a) (Count II), false advertisement and unfair competition under 15 U.S.C. § 1125(a)(1)(A) (Count III) and 15 U.S.C. § 1125(a)(1)(B) (Count IV), and trademark dilution under 15 U.S.C. § 1125(c) (Count V), as well as claims of common law trademark infringement and unfair competition (Count VI), and unfair competition under Massachusetts law, Mass. Gen. Laws ch. 93A (Count VII).  [Compl. ¶¶ 98–127].  API moved for a preliminary injunction against all defendants, [ECF No. 4], and, after the Court directed defendants to respond to the motion, [ECF No. 21], the Yatco Defendants filed a response on April 13, 2023, stating that they do not oppose the entry of the preliminary injunction, [ECF No. 28].  After no other defendant objected or otherwise responded, the Court granted API's motion for preliminary injunction on May 8, 2023.  [ECF No. 32].  Following discovery, on October 25, 2024, Yatco Distribution and Yatco Energy—the Yatco Movants—moved for summary judgment on all counts, [ECF No. 67], and API filed its

---

[9] The other defendants are American Premium Lubricants, LLC, Questron Packaging, LLC, America Petro, LLC, Nabil Barada, Maha Barada, Oussama Dabaji, Ahmad Abadi, Ali Tarhini, and John Does 1-10.  [Compl.].

summary judgment motion as to Yatco Distribution and Yatco Lubricants on Counts I, II, and

VII, asking the Court to find their conduct willful, award statutory damages of $2 million, and

permanently enjoin them from using API Certification Marks and the API Service Category

designation without successful completion of relevant tests, [ECF No. 70].  The Yatco

Defendants opposed API's motion for summary judgment on November 14, 2024, [ECF Nos. 72,

73], and API replied on November 27, 2024, [ECF No. 78].  API opposed Yatco Distribution and

Yatco Energy's motion on November 15, 2024, [ECF No. 76], and Yatco Distribution and Yatco

Energy replied on November 26, 2024, [ECF No. 77].

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  An issue is considered "genuine" when "the evidence of record permits a

rational factfinder to resolve it in favor of either party."  Borges ex rel. S.M.B.W. v. Serrano-

Isern, 605 F.3d 1, 4–5 (1st Cir. 2010) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896

F.2d 5, 8 (1st Cir. 1990)).  A fact is considered "material" when "its existence or nonexistence

has the potential to change the outcome of the suit."  Id. at 5 (citing Martínez v. Colón, 54 F.3d

980, 984 (1st Cir. 1995)).

"To succeed in showing that there is no genuine dispute of material fact, the moving

party must direct [the Court] to specific evidence in the record that would be admissible at trial."

Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015).  "That is, it must

'affirmatively produce evidence that negates an essential element of the non-moving party's

claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party

will be unable to carry its burden of persuasion at trial.'"  Id. at 4–5 (quoting Carmona v. Toledo,

215 F.3d 124, 132 (1st Cir. 2000)).  Once the moving party has laid out its basis for summary judgment, the burden shifts to the party opposing summary judgment to demonstrate, "with respect to each issue on which she would bear the burden of proof at trial, . . . that a trier of fact could reasonably resolve that issue in her favor."  Borges, 605 F.3d at 5.

On a motion for summary judgment, the Court reviews "the entire record in the light most hospitable to the party opposing summary judgment."  Podiatrist Ass'n v. La Cruz Azul de P.R., Inc., 332 F.3d 6, 13 (1st Cir. 2003) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)).  Where inferences are to be drawn from the proffered facts, those inferences "must be viewed in the light most favorable to the party opposing the motion."  Oleskey ex rel. Boumediene v. U.S. Dep't of Def., 658 F. Supp. 2d 288, 294 (D. Mass. 2009) (quoting Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 836 (D.C. Cir. 1979)).  The Court, however, "safely may ignore conclusory allegations, improbable inferences, and unsupported speculation."  Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (internal quotation and citation omitted).

When a court faces cross-motions for summary judgment, it applies the above analysis, unaltered, "to each motion in turn."  Wilkinson v. Chao, 292 F. Supp. 2d 288, 291 (D.N.H. 2003) (citing Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)); see also Cochran, 328 F.3d at 6 ("This framework is not altered by the presence of cross-motions for summary judgment.").

## III.    DISCUSSION

### A.    API's Motion for Summary Judgment

API moves for summary judgment against Yatco Distribution and Yatco Lubricants on Count I (federal trademark infringement), Count II (federal trademark counterfeiting), and Count VII (unfair competition under Ch. 93A).  [ECF Nos. 70, 71].

### 1. Count II (Trademark Infringement, 15 U.S.C. § 1114(1)(a))[10]

Count II of the Complaint is based on the following language in the Lanham Act:

> Any person who shall, without the consent of the registrant . . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1)(a).  Here, as the Court understands it, the principal dispute is whether Yatco Distribution and Yatco Lubricants were engaged in the "sale, offering for sale, distribution, or advertising" of the Counterfeit Products.  Id.; see [ECF No. 71 at 12–13]; [ECF No. 73 at 3–10].  As to Yatco Lubricants, API argues that Yatco Lubricants purchased the Counterfeit Products from Questron in bulk, sold the products to J. Polep for storage, then purchased the products back from J. Polep, and resold the engine oil in smaller quantities to Yatco-branded stores.  [ECF No. 71 at 12].  The Yatco Defendants do not dispute that Yatco Lubricants purchased Counterfeit Products from Questron and then shipped the products to J. Polep, [ECF No. 73 at 2–3, 12], but disagree that Yatco Lubricants repurchased the oils from J. Polep, [id. at 3–4].  Specifically, they contend that J. Polep supplied the Counterfeit Products to Yatco-branded stores and that because

_____

[10] The Court addresses the claims as presented in API's memorandum, which begins with Count II.  [ECF No. 71 at 15].

these stores operate independently from the Yatco Defendants, Yatco Lubricants is not liable.[11]
See [id. at 3–4, 10–12]. The Yatco Defendants' position, however, misses the mark. Although it
is unclear from the record whether Yatco Lubricants sold the Counterfeit Products to Yatco-
branded stores after repurchasing the oils from J. Polep, compare [ECF No. 71-2 at 16:7–9], with
[id. at 22:6–14], it is undisputed that Yatco Lubricants sold Counterfeit Products to J. Polep,
[SOF ¶¶ 15, 24]; see also [ECF No. 71-1 ¶ 6 (former president and owner of Questron
confirming that Questron sold Counterfeit Products to Yatco Lubricants)]; [ECF No. 71-2 at
22:2–8 (Hassan Yatim testifying that Yatco Lubricants was the only Yatco entity purchasing oil
from Questron and that Yatco Lubricants would sell the oil to J. Polep), 31:4–9 (the Questron oil
was shipped to J. Polep)]. As such, there is no genuine dispute of material fact about whether
Yatco Lubricants' actions fall under § 1114(1)(a).

Yatco Distribution presents a closer call. API argues that Yatco Distribution is liable
because (i) the Counterfeit Products were featured on the Yatco Defendants' only website,
yatcoenergy.com, [ECF No. 71 at 12]; [ECF No. 78 at 2–3]; (ii) the proceeds from the sale of
Counterfeit Products in Yatco-branded stores were transferred to Yatco Distribution, [ECF No.
71 at 13]; [ECF No. 78 at 8], and (iii) invoices show that Yatco Distribution purchased
Counterfeit Products from Questron and sold those products to J. Polep, [ECF No. 78 at 8]. The
Yatco Defendants disagree, contending that (i) Yatco Distribution "played no role in the
purchase or sale" of any of the Counterfeit Products, [ECF No. 73 at 9, 11]; (ii) Questron had no

---

[11] In support of their argument, the Yatco Defendants emphasize that they were not aware that
"Questron was producing substandard oils and affixing API's trademarked labeling to the
products" and that "Yatco Lubricants . . . unwittingly purchase[d] oils which were counterfeit
from Questron." [ECF No. 73 at 2–5, 12]. Such arguments, however, are more appropriately
considered when assessing either intent or willfulness in adopting a counterfeit mark. See
Visible Sys. Corp. v. Unisys Corp., 551 F.3d 65, 75 (1st Cir. 2008).

business relationship with Yatco Distribution, [id. at 11], and (iii) the Yatco-branded stores operate independently from Yatco Distribution, [id. at 9, 11].

Based on the evidence presented and drawing, as it must, all inferences in the light most favorable to the Yatco Defendants, Oleskey, 658 F. Supp. 2d at 294, the Court finds that there is a genuine dispute of material fact as to whether Yatco Distribution sold, offered for sale, distributed, or advertised Counterfeit Products.  On the one hand, the evidence indicates that yatcoenergy.com, which seemingly served all Yatco entities, advertised Questron oil, [ECF No. 71-3 at 23:8-15]; [July 2022 Letter at 1], Yatco Distribution paid a Questron invoice on at least one occasion in 2017, see [ECF No. 75-1 (Questron invoice directed at "yatco," and payment confirmation representing that Yatco Distribution paid the invoice)], and J. Polep stored the Counterfeit Products on behalf of Yatco Distribution at some point in 2019, see [ECF No. 75-11 (straight bill of lading noting that "Yatco Dist" was the consignee of products shipped by J. Polep)].  From this evidence, a jury could infer that Yatco Distribution's conduct comes under the purview of § 1114(1)(a).  On the other hand, there is also evidence that Yatco Distribution neither purchased Counterfeit Products from Questron, [ECF No. 71-2 at 22:2–3 (Hassan Yatim testifying that Yatco Lubricants was the only Yatco entity purchasing oil from Questron)]; see also [ECF No. 71-1 ¶ 6 (former owner and president of Questron confirming that the company sold Counterfeit Products to Yatco Lubricants)], nor distributed Counterfeit Products to Yatco-branded stores, [ECF No. 71-3 at 18:14–19:4 (Tarek Yatim testifying that Yatco Distribution only supplied gasoline and diesel fuels to Yatco-branded gas/convenience stores)].  The fact that Questron's invoices were issued to an unspecified entity, "yatco," [ECF No. 73-3], and sent to an address used by both Yatco Lubricants

and Yatco Distribution, [ECF No. 71-2 at 16:23–17:4], obscures the matter further.[12]  Because summary judgment "admits of no room for credibility determinations [and] no room for the measured weighing of conflicting evidence such as the trial process entails," the Court cannot find that, at this stage, API has met its burden as to Yatco Distribution.  Casas Off. Machines, Inc. v. Mita Copystar Am., Inc., 42 F.3d 668, 684 (1st Cir. 1994) (citation modified); see also id. ("If the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the nonmovant.").[13]   The Court therefore undertakes the infringement analysis as to only Yatco Lubricants.

---

[12] API requests that the Court disregard the affidavit of Yasmin Dabboussi, Director of Human Resources and Operations at Yatco Distribution, which corrects two statements that Tarek Yatim made during his deposition.  See [ECF No. 73-5]; [ECF No. 78 at 5–6].  First, although Tarek Yatim testified that he draws his salary from Yatco Distribution, the affidavit states that he does not.  [ECF No. 71-3 at 50:8-10]; [ECF No. 73-5 ¶¶ 2–4].  Second, the affidavit says that Tarek Yatim incorrectly testified that the Yatco-branded stores deposit their proceeds into Yatco Distribution's bank account.  [ECF No. 73-5 ¶ 6].  Because its analysis does not rely on the affidavit's correction, the Court, at this juncture, declines to make any findings on the admissibility of the affidavit, but preserves API's right to raise this evidentiary issue should the case proceed to trial.

[13] API further argues that Yatco Distribution admitted liability in its Answer to the Complaint because the Yatco Defendants denied "knowingly or intentionally" selling or purchasing Counterfeit Products, [ECF No. 8 ¶ 78], or being significant "players" "to the extent that such designation signifies knowingly wrongful conduct," [id. ¶ 80], and because they stated that they "advertised products [they] reasonably believed were as warranted by its vendor[]," [id. ¶ 79], [ECF No. 73 at 17–18].  First, the Court cannot agree that these answers to the Complaint, plainly give rise to an admission of liability.  Compare [Compl. ¶¶ 78–80], with [ECF No. 8 ¶¶ 78–80].  Second, and more importantly, this is not a situation where the Yatco Defendants "ha[ve] given clear answers to unambiguous questions" and are trying to "create a conflict and resist summary judgment" with evidence such as an affidavit that "is clearly contradictory" to the prior answers.  Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 5–6 (1st Cir. 1994).  Instead, the record here is replete with conflicting evidence from which a reasonable jury could find for either party and the Yatco Defendants' answers, therefore, do not change the Court's analysis.

In order to succeed on a trademark infringement claim, a plaintiff must establish two elements, namely that: "(1) the trademarks are entitled to trademark protection, and (2) the allegedly infringing use is likely to cause consumer confusion." Sound United, LLC v. SalusAudio.com, No. 21-cv-12029, 2022 WL 14757794, at *2 (D. Mass. Oct. 25, 2022) (citation modified) (quoting Bose Corp. v. Ejaz, 732 F.3d 17, 26 (1st Cir. 2013)). As to the first prong, "registration [on the Principal Register of the United States Patent and Trademark Office] serves as prima facie evidence that the trademark[] [is] entitled to protection." Stillwater Designs & Audio, Inc. v. eBay Reseller "archer_store", No. 23-cv-11210, 2023 WL 7195690, at *2 (D. Mass. Nov. 1, 2023) (quoting Bose Corp., 732 F.3d at 26); see 15 U.S.C. § 1057(b) ("A certificate of registration of mark . . . shall be prima facie evidence of the validity of the registered mark . . . .").

By submitting API's federal registration, API has presented prima facie evidence of the API Certification Marks' validity and API's exclusive nationwide right to use the marks. See [ECF Nos. 1-2, 1-3]. Further, because the Yatco Defendants do not contest API's federal registration, see generally [ECF Nos. 69, 73, 74], the Court proceeds to the second prong of the infringement analysis, Stillwater Designs, 2023 WL 7195690, at *2.

The First Circuit has interpreted "likely to cause consumer confusion" to mean "more than the theoretical possibility of confusion." Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 (1st Cir. 2008) (quoting International Association of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr., 103 F.3d 196, 200 (1st Cir. 1996)); see Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 9–10 (1st Cir. 2012) (same). "In other words, the allegedly infringing conduct must create 'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'" Boston Duck Tours, LP, 531 F.3d at 12 (quoting International Association of Machinists, 103

F.3d at 201).  The reasonably prudent purchaser is not limited to the actual or potential buyer of the product but also includes "persons in a position to influence the purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner." Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp., 376 F.3d 8, 10, 16 (1st Cir. 2004) ("[T]he likelihood of confusion inquiry . . . includes others whose confusion threatens the trademark owner's commercial interest in its mark.").  Courts in this Circuit consider the following non-exhaustive list of factors, known as the Pignons factors, when assessing the likelihood of confusion:

> (1) the similarity of the marks; (2) the similarity of the goods (or, in a service mark case, the services); (3) the relationship between the parties' channels of trade; (4) the juxtaposition of their advertising; (5) the classes of prospective purchasers; (6) the evidence of actual confusion; (7) the defendant's intent in adopting its allegedly infringing mark; and (8) the strength of the plaintiff's mark.

Shell Co. (Puerto Rico) Ltd. v. Los Frailes Serv. Station, Inc., 605 F.3d 10, 22 & n.9 (1st Cir. 2010) (quoting International Association of Machinists, 103 F.3d at 201); see Pignons S. A. de Mecanique v. Polaroid Corp., 657 F.2d 482 (1st Cir. 1981).  "No one factor is necessarily determinative, but each must be considered." Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1205 (1st Cir. 1983).  The inquiry is "highly fact-intensive," Shell Co., 605 F.3d at 22, and "resolving this issue on summary judgment is disfavored," Dorpan, S.L. v. Hotel Melia, Inc., 728 F.3d 55, 66 (1st Cir. 2013); see also Bos. Athletic Ass'n v. Sullivan, 867 F.2d 22, 24 (1st Cir. 1989) (noting that "infringement and unfair competition cases often present factual issues that render summary judgment inappropriate" (quoting Kazmaier v. Wooten, 761 F.2d 46, 48–49 (1st Cir. 1985))); AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 616 (7th Cir. 1993) ("[A] motion for summary judgment in trademark infringement cases must be approached with great caution."); Country Floors, Inc. v. P'ship Composed of Gepner & Ford,

930 F.2d 1056, 1063 (3d Cir. 1991) (noting that in the likelihood-of-confusion context "summary judgments are the exception"); cf. Pignons, 657 F.2d at 486 (1st Cir. 1981) (explaining that, although not unheard of, "summary disposition is usually inappropriate in complex infringement and unfair competition cases").[14]

### i.    The Similarity of the Marks

"The degree of similarity between the marks is the 'single most important factor in determining likelihood of confusion.'" Solmetex, LLC v. Dentalez, Inc., 150 F. Supp. 3d 100, 111–12 (D. Mass. 2015) (quoting McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350, 367 (3d Cir. 2007)). "[S]imilarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." Boston Duck Tours, LP, 531 F.3d at 29 (quoting Pignons, 657 F.2d at 487); see Copy Cop, Inc. v. Task Printing, Inc., 908 F. Supp. 37, 44 (D. Mass. 1995) ("[T]he relevant standard is the 'total effect' of the mark, considering sight, sound, and meaning." (citing Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 817 (1st Cir. 1987))). "Marks should not be simply compared side-by-side, but 'in light of what occurs in the marketplace, taking into account the circumstances surrounding the purchase of the goods . . . .'" Anheuser-Busch, Inc. v. Caught-on-Bleu, Inc., 288 F. Supp. 2d 105, 114–15 (D.N.H. 2003) (quoting Copy Cop, Inc., 908 F. Supp. at 44), aff'd, 105 F. App'x 285 (1st Cir. 2004).

---

[14] The Court observes that the Yatco Defendants' opposition to API's motion for summary judgment does not squarely address the two-prong infringement analysis.  See generally [ECF No. 73].  That, however, does not relieve API of "its burden to demonstrate undisputed facts entitling it to summary judgment as a matter of law."  Aguiar-Carrasquillo v. Agosto-Alicea, 445 F.3d 19, 25 (1st Cir. 2006).

The API Certification Marks and the marks used on the Questron Counterfeit Products are near identical; they share the same shape, words, and use of capital letters.  <u>Compare</u> [API Starburst Mark], <u>with</u> [ECF No. 71-6 at 6–8 (Counterfeit Product found in Yatco-branded gas/convenience store); ECF No. 71-1 ¶ 4].  A reasonable jury could therefore readily find that the marks are substantially similar, and this factor thus weighs in API's favor.




*API Starburst Mark*          *Counterfeited API Mark*

### ii.  <u>The Similarity of the Goods</u>

As to the second factor, API offers little explanation beyond writing that "each factor assessing the competitive nature of the API certified authentic products and Yatco's Counterfeit Products demonstrates the identical nature of the products."  [ECF No. 71 at 16].  Although the Court need not credit conclusory statements, it cannot find that there is a dispute of material fact as to the similarity of the goods.  The Questron Counterfeit Products are the type of products that API ordinarily certifies, and Questron affixed the counterfeited API Certification Marks to denote that its engine oils comply with API standards and requirements, thus conveying quality and performance assurances associated with API's brand.  [ECF No. 71-4 at 3–4; ECF No. 71-1].  Accordingly, this factor, too, favors API.  <u>See</u> <u>SoClean, Inc. v. Sunset Healthcare Sols., Inc.</u>, 554 F. Supp. 3d 284, 302 (D. Mass. 2021) (considering the first two <u>Pignons</u> factors together because "because the goods . . . are the [m]arks"), <u>aff'd</u>, 52 F.4th 1363 (Fed. Cir. 2022).

17

iii.  <u>3–5. Relationship between the Parties Advertising, Channels of Trade, and Classes of Prospective Purchasers</u>

"Factors three (channels of trade), four (advertising), and five (classes of prospective purchasers) are often considered together because they tend to be interrelated."  <u>Beacon Mut. Ins. Co.</u>, 376 F.3d at 19; <u>see also</u> <u>Peoples Fed. Sav. Bank</u>, 672 F.3d at 14 (describing these factors as "interrelated").  API argues that the Questron engine oils are identical, "the exact products API certifies using the API Certification Marks," and that "these engine oils are sold on the same shelf space through identical channels of trade and to the identical consumers."  [ECF No. 71 at 16].  As such, API continues, the "Counterfeit Products are competing directly with genuine engine oils manufactured and bottled in compliance with API performance standards."  [<u>Id.</u>].  API further asserts that because the "relevant buyer class is composed of ordinary buyers," the likelihood of confusion is "substantially increased."  [<u>Id.</u>].

API did not include a single record citation to support its analysis.  [ECF No. 71 at 16–17].  Because determining the likelihood of confusion "is a particularly fact-intensive" query, despite the seemingly clear likelihood of confusion, the Court requires a more robust record to support its assessment of the factors at issue here.  <u>Dorpan, S.L. v. Hotel Melia, Inc.</u>, 728 F.3d 55, 66 (1st Cir. 2013); <u>see also</u> <u>Higgins v. New Balance Athletic Shoe, Inc.</u>, 194 F.3d 252, 260 (1st Cir. 1999) ("The district court is free to disregard arguments that are not adequately developed").  The Court thus defers on the third, fourth, and fifth factors and weighs them neutrally for the purposes of the instant motion.

iv.  <u>Evidence of Actual Confusion</u>

"[E]vidence of actual confusion is oftentimes 'considered the most persuasive evidence of likelihood of confusion because past confusion is frequently a strong indicator of future confusion.'"  <u>Santander Consumer USA Inc. v. Walsh</u>, 762 F. Supp. 2d 217, 227 (D. Mass 2010)

18

(quoting Beacon Mut. Ins. Co., 376 F.3d at 18).  Nonetheless, "[a]ctual confusion is not a prerequisite to a finding of likelihood of confusion."  Visible Sys, Corp. v. Unisys Corp., 551 F.3d 65, 74 (1st Cir. 2008).  "[A] trademark holder's burden is to show likelihood of confusion, not actual confusion."  Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 120 (1st Cir. 2006).  "Historically, [the First Circuit has] attached substantial weight to a trademark holder's failure to prove actual confusion only in instances in which the relevant products have coexisted on the market for a long period of time."  Id. at 121.  "[A]bsent evidence of actual confusion, when the marks have been in the same market, side by side, for a substantial period of time, there is a strong presumption that there is little likelihood of confusion."  Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Crédito Oriental, 832 F.3d 15, 30–31 (1st Cir. 2016) (quoting Pignons, 657 F.2d at 490).  "Applying this principle, the First Circuit has found that little or no evidence of actual confusion over periods of three and one-half years, four years, and six years strongly indicate against a likelihood of confusion."  Butcher Co. v. Bouthot, 124 F. Supp. 2d 750, 758 (D. Me. 2001) (citations omitted).

API has not offered any evidence of actual confusion.  Instead, API argues that consumers are likely to be confused because "API certified engine oils . . . are essentially interchangeable," and given that the typical, ordinary consumer does not choose engine oils with great care, it is probable that they will "with a quick glance accept [the Yatco Defendants'] false representations."  [ECF No. 71 at 17].  Although the Court does not disagree with API's reasoning, it also cannot ignore that the Questron Counterfeit Products were initially sold in Yatco-branded stores in 2017, [SOF ¶¶ 23, 25], with API identifying samples of the product as late as May 2022, [ECF No. 71-6].  The Counterfeit Products were therefore on the market for at least five years, yet API has not attempted to offer any evidence of actual confusion.  IEP Techs.,

LLC v. KPM Analytics, Inc., No. 1:21-cv-10417, 2024 WL 5198864, at *9 (D. Mass. Dec. 23, 2024) (concluding that the sixth <u>Pignons</u> factor "weigh[ed] heavily in favor of [defendant] because the parties' marks ha[d] coexisted in the marketplace for over six years without any evidence of actual consumer confusion"). That said, the Court is mindful that "proof of actual confusion is not essential to finding likelihood of confusion," <u>Boston Duck Tours, LP</u>, 531 F.3d at 25, and, as such, weighs this factor neutrally or at most in slight favor of the Yatco Defendants.

v.  <u>Intentional Copying</u>

API has not made any effort to address the seventh factor, namely Yatco Lubricants' intent in adopting the API Counterfeit Marks. <u>See</u> [ECF No. 71 at 15–17]. The record indicates that until J. Polep received the February 2019 Letter, the Yatco Defendants were unaware of API's role in certifying engine oils. [ECF No. 71-2 at 23:24–24:6]. Because the evidence thus does not suggest that the Yatco Defendants sought "to take advantage of [API's] goodwill and promotional efforts," <u>Star Fin. Servs., Inc. v. AASTAR Mortg. Corp.</u>, 89 F.3d 5, 11 (1st Cir. 1996), the seventh factor weighs against API.

vi.  <u>The Strength of API's Mark</u>

"Under the Lanham Act strong marks enjoy the greatest protection against infringement." <u>International Association of Machinists,</u>103 F.3d at at206. In assessing a mark's strength, courts consider "the length of time the mark has been used, its renown in the plaintiff's field of business, and the plaintiff's actions to promote the mark." <u>Star Fin. Servs.</u>, 89 F.3d at 11; <u>see also</u> <u>Pub. Impact, LLC v. Bos. Consulting Grp., Inc.</u>, 169 F. Supp. 3d 278, 292 (D. Mass. 2016) ("[C]ourts analyze the strength of a mark by focusing on its commercial strength instead of its theoretical classification.").

20

API neglected to address the eighth Pignons factor.  See [ECF No. 71 at 15–17].  That said, the record establishes that the API Starburst and Donut Marks have been in use since 1994 and 1995, respectively, [API Starburst Mark; API Donut Marks], the EOLCS program has been in operation since 1985, licensing the API Starburst Mark to over 800 entities and conducting regular performance tests on licensed engine oils, and that the majority of engine oils in the United States are API licensed and bear the API Certification Marks, [ECF No. 5-1 ¶¶ 5, 9, 11]. A reasonable jury could infer from this evidence that API's mark is strong.  On the other hand, the Court lacks a sufficiently developed record to properly assess API's "renown" in the industry and its actions to promote the mark.  See, e.g., Pignons, 657 F.2d at 491 (acknowledging plaintiff's "relatively strong mark" as plaintiff "[was] a leader in the photographic industry" and "[m]agazine comments speak of [its] mark . . . as a 'prestigious name'"); IEP Techs., 2024 WL 5198864, at *10 (observing that plaintiff did not "detail[] its efforts to promote the mark beyond describing generally how it advertises its products in-person at trade shows and industry exhibitions").  As such, the Court finds that this factor, although barely, favors the Yatco Defendants.

Overall, this is a close call, and API's failure to present well-reasoned arguments and address several Pignons factors does not inure to its benefit.[15]  The first and second factors, given the near identical nature of the API Starburst Mark and the mark on the Questron Counterfeit Products, favor API and a reasonable jury could infer that the API counterfeit marks create a substantial likelihood of confusion.  That said, the sixth and seventh factors—evidence of actual

---

[15] The Court observes that had API been more diligent in its analysis of the Pignons factors, it would have likely granted summary judgment on Count II (and, therefore, Counts I and VII). API's perfunctory analysis, however, tied the Court's hands.

confusion and intent—tilt, no matter how slightly, in the opposite direction, and the Court cannot conclude that a reasonable jury could not find in favor of Yatco Lubricants.  See Oriental Fin. Grp., 832 F.3d at 25 (describing the "first, sixth, and seventh factors" as "the three most important factors in determining the likelihood of confusion").  Accordingly, the Court denies summary judgment on Count II.

### 2. Count I (Trademark Counterfeiting, 15 U.S.C. §§ 1114(1)(a), 1116(d))

Section 1114(1)(a) also establishes a cause of action for trademark counterfeiting. Arcona, Inc. v. Farmacy Beauty, LLC, 976 F.3d 1074, 1078 (9th Cir. 2020); Polo Fashions, Inc. v. Branded Apparel Merch., Inc., 592 F. Supp. 648, 650 (D. Mass. 1984).  The Lanham Act defines counterfeit as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.  In order to establish trademark counterfeiting, a plaintiff must show that the counterfeiting mark is "likely to cause confusion."  Arcona, 976 F.3d at 1078; Polo Fashions, 592 F. Supp. at 650; Sound United, 2022 WL 14757794, at *2.[16] Therefore, because the analysis here is the same as under Count II, the Court denies summary judgment for the reasons articulated supra.

### 3. Count VII (Unfair competition under Massachusetts law, Mass. Gen. Laws ch. 93A)

Chapter 93A "is a statute of broad impact that prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Anoush Cab,

---

[16] The Court notes that this Circuit seemingly has not established a clear standard for counterfeit infringement, including whether there needs to be evidence of a likelihood of confusion.  That said, at least one other circuit has grappled with the issue and determined that, based on the plain text of § 1114(1)(a), "likely to cause confusion" is a requirement for a counterfeiting claim. Arcona, 976 F.3d at 1078.  The Court agrees and sees no reason to depart from the Ninth Circuit's rationale.

Inc. v. Uber Techs., Inc., 8 F.4th 1, 15 (1st Cir. 2021) (internal quotation marks omitted)

(quoting Exxon Mobil Corp. v. Att'y Gen., 94 N.E.3d 786, 791 (Mass. 2018)).  Specifically, a

successful Chapter 93A, section 11 claim must allege that "(1) the defendant engaged in an

unfair method of competition or committed an unfair deceptive act or practice; (2) a loss of

money or property was suffered; and (3) the defendant's unfair or deceptive method, act or

practice caused the loss suffered."  Id. at 16.  Where, as here, the Chapter 93A claim is

predicated on federal trademark infringement, it rises and falls with the federal claim.  Studio

Method, LLC v. Nantucket Studio, LLC, No. 21-cv-11763, 2023 WL 5179199, at *15 (D. Mass.

Aug. 11, 2023); Bayshore Grp. Ltd. v. Bay Shore Seafood Brokers, Inc., 762 F. Supp. 404, 415

(D. Mass. 1991) (no Chapter 93A theory of liability where there is no likelihood of confusion).

The Court therefore denies summary judgment on Count VII.

 In light of its rulings as to Counts I, II, and VII, the Court need not and will not address

API's willfulness argument or its requests for statutory damages and a permanent injunction.[17]

See Sound United, 2022 WL 14757794, at *5 (when considering permanent injunction "[i]n

trademark cases, the 'key issue is the likelihood of success on the merits because the other

decisions will flow from that ruling'" (quoting Boustany v. Bos. Dental Group, Inc., 42 F. Supp.

2d 100, 104 (D. Mass. 1999))).  API's motion for summary judgment, in sum, is **DENIED**.

---

[17] The Court accordingly does not consider API's allegation that the Yatco Defendants destroyed records, [ECF No. 71 at 13], which API raises in part in connection with its request for statutory damages, [id. at 20–21].

**B.      Yatco Distribution and Yatco Energy's Motion for Summary Judgment**

As an initial matter, the Court notes that although the Yatco Movants seek summary judgment on all counts, they fail to advance any legal arguments or specify the basis for summary judgment as to any of the seven counts.  See generally [ECF Nos. 68, 77].  That alone is a basis to deny the Yatco Movants' motion.  See Healy v. U.S. Bank, N.A. ex rel. LSF9 Master Participation Tr., No. 16-cv-11996, 2018 WL 3733934, at *4 (D. Mass. Aug. 3, 2018) (finding that plaintiff "[fell] well short of demonstrating that he is entitled to judgment as a matter of law . . . [because he] present[ed] no relevant facts and advance[d] no legal arguments"); HMC Assets, LLC v. Conley, No. 14-cv-10321, 2016 WL 4443152, at *24 (D. Mass. Aug. 22, 2016) (denying summary judgment on claims where moving party made only a "global assertion that it is entitled to summary judgment" yet "neglected to squarely spell out its argument by adequately addressing [those] particular claims"); Griffin v. Town of Whitefield, No. 07-cv-243, 2008 WL 3166473, at *3 (D.N.H. Aug. 5, 2008) (denying summary judgment where plaintiff made no legal argument and cited no authority explaining why he was entitled to judgment as a matter of law), aff'd sub nom. Griffin v. Whitefield, 341 F. App'x 655 (1st Cir. 2009).

Nonetheless, in an abundance of caution, the Court focuses on what it understands to be the crux of the Yatco Movants' argument, namely that there is no genuine dispute of material fact that Yatco Distribution and Yatco Energy did not sell, offer for sale, distribute, or advertise the Counterfeit Products.  Specifically, the Yatco Movants assert that (i) Yatco Energy, which was formed on January 3, 2022, did not exist when the Counterfeit Products were acquired between 2017 and 2018, and (ii) the only Yatco entity purchasing the Questron oil was Yatco Lubricant.  [ECF No. 68 at 4, 8–9].  API responds that the relevant evidence shows that

(i) although Yatco Energy was only formed in 2021, Yatco-branded gas/convenience stores sold Counterfeit Products under the management and direction of Yatco Energy until at least May 11, 2022; (ii) Yatco Distribution sold Counterfeit Products to J. Polep, and (iii) the Counterfeit Products were advertised through yatcoenergy.com, a website shared by all Yatco entities.  [ECF No. 76 at 14–19].  The Yatco Movants, in turn, reply that an affidavit submitted by Questron's former owner expressly states that Counterfeit Products were sold to Yatco Lubricants only and deposition testimony makes clear that neither Yatco Energy nor Yatco Distribution bought Questron products.  [ECF No. 77 at 3–6].

The Court has already determined that a reasonable jury could infer that Yatco Distribution sold, offered for sale, distributed, or advertised the Counterfeit Products.  See supra. As to Yatco Energy, the Court similarly finds that there is a genuine dispute of material fact. While there is evidence that Yatco Energy was not involved in the sale or distribution of the Counterfeit Products, [ECF No. 71-3 at 18:3–5 (Tarek Yatim testifying that Yatco Energy was not involved in the purchase or distribution of motor oil)], the record also indicates that Questron engine oil was advertised on yatcoenergy.com, a website used by all Yatco entities, [id. at 23:8–15].  As such, the Yatco Movants' motion for summary judgment is **DENIED**.

## IV.    CONCLUSION

For the reasons stated above, Yatco Energy and Yatco Distribution's motion for summary judgment, [ECF No. 67], is **DENIED**, and API's motion for summary judgment, [ECF No. 70], is **DENIED**.

**SO ORDERED.**

September 25, 2025                                          */s/ Allison D. Burroughs*
                                                            ALLISON D. BURROUGHS
                                                            U.S. DISTRICT JUDGE