UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AMERICAN PETROLEUM INSTITUTE,<br><br>Plaintiff,<br><br>v.<br><br>YATCO ENERGY LLC, YATCO DISTRIBUTION, LLC, YATCO LUBRICANTS, LLC, AMERICAN PREMIUM LUBRICANTS, LLC, QUESTRON PACKAGING, LLC, AMERICA PETRO, LLC, NABIL BARADA, MAHA BARADA, OUSSAMA DABAJA, AHMAD ABADI, ALI TARHINI, and JOHN DOES 1-10,<br><br>Defendants. | * * * * * * * * * * * * * * * * * * * * * | Civil Action No. 23-cv-10498-ADB |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff American Petroleum Institute ("API" or "Plaintiff") alleges that by manufacturing and selling a substandard oil labeled with counterfeit marks, Defendants Ahmad Abadi ("Abadi"), Ali Tarhini ("Tarhini"), America Petro, LLC ("America Petro"), and Questron Packaging, LLC ("Questron") (collectively the "Default Defendants"), among others, are liable for trademark counterfeiting and trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114(1)(a), 1116(d), and for unfair competition under Massachusetts law, Mass. Gen. Laws ch. 93A. [ECF No. 1 ("Complaint" or "Compl.")]. Presently before the Court is API's motion

for default judgment on its federal trademark counterfeiting claim against the Default Defendants. [ECF No. 123]. For the reasons stated herein, the motion is **GRANTED**.

## I. BACKGROUND

### A. Factual Background

A more fulsome recitation of the factual background can be found in the Court's summary judgment memorandum and order, [ECF No. 79], and the Court assumes familiarity with those facts and incorporates them herein. The following supplements that prior writing and largely addresses the allegations of particular relevance to the Default Defendants.

#### 1. Parties

Plaintiff brought this action against several corporate defendants, including Yatco Energy LLC, Yatco Distribution LLC, and Yatco Lubricants LLC (collectively "Yatco"); American Premium Lubricants ("APL"); Questron; America Petro;[1] and several individual defendants, including, Nabil Barada ("Barada"), who during the relevant time period has held between 50% and 100% ownership of Questron and 25% ownership of APL; Maha Barada, Barada's wife; Oussama Dabaja, who has held between 33% and 75% ownership of APL; Abadi, who has held between 33% and 50% ownership of Questron and 25% ownership of APL; and Tarhini, owner of America Petro. [Compl. ¶¶ 5–19]. Plaintiff claims that Questron manufactures motor oil and America Petro distributes motor oil, including Questron products, and that Abadi and Tarhini are the conscious, moving force behind the conduct of these corporations. [Id. ¶ 77].

[1] Plaintiff claims that Questron and America Petro are alter egos of Abadi and Tarhini, respectively, [Compl. ¶ 49], and that the two corporations are used as paper entities only and retain no funds themselves, [id. ¶ 90].

Plaintiff is an industry association for the petroleum and natural gas industry, and it uses its corporate trademarks and names, AMERICAN PETROLEUM INSTITUTE and API, together with certification marks, for a range of products, services, and programs. [ECF No. 5-1 ¶ 3]. Plaintiff operates a licensing and certification program for engine oil standards for passenger vehicles called API 1509, Engine Oil Licensing and Certification System ("EOLCS"), which authorizes engine oil manufacturers to use Plaintiff's federally registered certification marks ("API Certification Marks" or "API Marks") if the manufacturers meet specified performance requirements. [Id. ¶¶ 4, 5, 10–12]; see, e.g., [ECF No. 1-2 (the federally registered API Certification Mark "Starburst," Reg. No. 1,864,428 (the "API Starburst"))]; [ECF No. 1-3 (the federally registered API Certification Mark "Donut," Reg. Nos. 1,872,999 and 1,868,779 (the "API Donut"))]. The engine oils that meet certain standards may also be identified by a performance standard designation called the API Service Category designation, demarked as "S_".[2] [ECF No. 5-1 ¶ 6].

2. Distribution and Sale of Oil

On November 10, 2016, Barada allegedly applied for API licensing of Questron-branded motor oil, but he never completed the application and Questron did not become licensed by API. [Compl. ¶ 55]. On July 24, 2017, API contacted Barada regarding the misuse of API Marks on Questron products, and Barada admitted to the alleged conduct and informed API that the remaining labels had been destroyed. [Id. ¶ 57]. On August 25, 2017, API again contacted Questron regarding the continued unauthorized use of API labels on products on Questron's

[2] The second letter of the "S_" designation has progressed alphabetically over time to reflect advances in engine technology, [ECF No. 5-1 ¶ 6], and the relevant API Service Category at issue here is "SN," see [ECF No. 71-1 ¶ 5].

website. [Id. ¶ 59]. Shortly thereafter, Questron contacted API seeking approval to use certain marks on its labels, [id. ¶ 61], and API responded that Questron's proposed labels infringed on API's Marks and demanded that Questron cease and desist its use of API's Marks, [id. ¶ 62]. On September 18, 2017, Barada informed API in writing that Questron had removed all marketing materials with the depiction from its website, destroyed all labels, and would no longer inquire as to whether it could use API depictions. [Id. ¶ 63].

On September 28, 2017, Questron sent two shipments of oil to Yatco, [Compl. ¶ 64], who then advertised and sold the products to customers in Massachusetts, [id. ¶¶ 78–79]. On March 24, 2018, API auditors found Questron oil in the marketplace in Massachusetts with counterfeit API Marks, including the API Starburst and a knock-off Starburst that Questron had sought but was denied permission to use. [Id. ¶ 65]. In February and March 2019, API again contacted Questron regarding its unauthorized use of API Marks and requested information regarding Questron's past sales and customers. [Id. ¶ 68].

Plaintiff alleges that all additional Questron oils that it found in the marketplace in 2018, and subsequently tested, failed to meet API's specifications and posed significant risk of damage to vehicles. [Id. ¶ 72]. It also asserts that Questron oil samples pulled from the marketplace after February 2019 continued to display counterfeit API Marks and failed additional quality assurance testing. [Id. ¶ 73]. Plaintiff claims that during the relevant time period, Abadi and Tarhini also distributed goods in commerce bearing counterfeit Starburst and Donut Marks through America Petro, which advertised extensive amounts of Questron branded oils. [Id. ¶ 77]. In support of this allegation, Plaintiff has submitted what it represents to be snapshots of America Petro's Facebook page advertising Questron branded products bearing API Marks or similar designs. [Id.]; [ECF No. 1-22].

Plaintiff contends that the use of counterfeit API Marks irreparably injures API and its marks, goodwill, and reputation as the certifier of high-quality standards. [Compl. ¶ 94]. Plaintiff also claims that the Default Defendants and the other defendants' failure to warn consumers that the counterfeit products did not meet API performance standards could have potentially harmed the public by causing engine damage. [Id. ¶ 96].

**B. Procedural History**

Plaintiff filed its Complaint on March 3, 2023, alleging various violations of the Lanham Act, including trademark counterfeiting, 15 U.S.C. §§ 1114(1)(a), 1116(d) (Count I), trademark infringement, 15 U.S.C. § 1114(1)(a) (Count II), false advertisement and unfair competition under 15 U.S.C. § 1125(a)(1)(A) (Count III) and 15 U.S.C. § 1125(a)(1)(B) (Count IV), and trademark dilution under 15 U.S.C. § 1125(c) (Count V), as well as claims of common law trademark infringement and unfair competition (Count VI), and unfair competition under Massachusetts law, Mass. Gen. Laws ch. 93A (Count VII). [Compl. ¶¶ 98–127]. On June 23, 2023, Plaintiff requested an entry of default against the Default Defendants, who had not answered or otherwise responded to the Complaint. [ECF No. 34]. The clerk of the Court entered a notice of default against the Default Defendants on June 28, 2023. [ECF No. 35].

Plaintiff moved for a preliminary injunction against all defendants, [ECF No. 4], to which only Yatco responded, [ECF No. 28], and the Court granted Plaintiff's motion for a preliminary injunction on May 8, 2023. [ECF No. 32]. On July 28, 2023, Plaintiff requested that the Court delay its consideration of default judgment against the Default Defendants while litigation proceeded against the other defendants. [ECF No. 43 ¶ 13]. After settling its claims with the non-Default Defendants, Plaintiff filed the instant motion for default judgment against the Default Defendants on April 16, 2026, [ECF No. 123], seeking a judgment only on the federal

trademark counterfeiting claim (Count I), but reserving the right to reassert its other claims against the Default Defendants should any of the Default Defendants successfully move to set aside the default judgment in the future.[3] [ECF No. 124 at 6].

## II. DISCUSSION

Pursuant to Rule 55(b), a plaintiff seeking a default judgment "must apply to the court" if the amount of damages claimed is not a "sum certain." Fed. R. Civ. P. 55(b). The Court must first assure itself that it has both subject matter jurisdiction and personal jurisdiction over the action. Plasterers' & Cement Masons' Loc. 40 Pension Fund v. Cap. Curbing Corp., No. 09-cv-00236, 2010 WL 1424722, at *2 (D.R.I. Mar. 12, 2010), adopted by 2010 WL 1376293 (D.R.I. Apr. 6, 2010). Once satisfied that jurisdiction is proper, the Court reviews the well-pleaded facts alleged in the complaint to determine whether they state a claim upon which relief may be granted. Ramos-Falcon v. Autoridad de Energia Electrica, 301 F.3d 1, 2 (1st Cir. 2002). Finally, if the Court finds that the complaint states a claim, it calculates damages and assesses the appropriateness of other relief. See Donovan v. Amps Elec., Inc., No. 22-cv-10989, 2022 WL 16639137, at *2 (D. Mass. Nov. 2, 2022).

### A. Jurisdiction

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. §§ 1114(1)(a) and 1116(d). To enter judgment, the Court must also be able to exercise personal jurisdiction over the Default Defendants, which requires proper service of process. See Precision Etchings & Findings, Inc. v. LGP Gem, Ltd., 953 F.2d 21, 23 (1st Cir. 1992). Plaintiff has filed

[3] Plaintiff has also stipulated to the dismissal of its claims against the John Doe defendants pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) in order to fully resolve this litigation. [ECF No. 124 at 6 n.2].

an affidavit of service stating that on March 26, 2023, its process server served the Complaint and summons on Abadi and America Petro by delivering the documents to Malak Tarhini, Abadi's spouse and a person designated to accept service of process for America Petro, at Abadi's residence located at 574 Superior Boulevard, Wyandotte, Michigan 48192. [ECF No. 34 ¶¶ 2–3]. Plaintiff's affidavit also states that on April 14, 2023, its process server served the Complaint and summons on Questron by delivering the documents to Barada, Questron's registered agent, at 574 Superior Boulevard, Wyandotte, Michigan 48192, [id. ¶ 8], and that on May 7, 2023, Plaintiff's process server served the Complaint and documents on Tarhini by delivering the documents to Abadi, a person of suitable age and discretion residing at 574 Superior Boulevard, Wyandotte, Michigan 48192, Tarhini's last known dwelling or usual place or abode, [id. ¶ 16]. None of the Default Defendants filed an answer or otherwise defended themselves in this action. [Id. ¶ 20]. Because the Default Defendants have not appeared or adduced any "rebuttal evidence to refute any presumption of valid service," Blair v. City of Worcester, 522 F.3d 105, 111–12 (1st Cir. 2008), the Court will accept the affidavit as evidence that service was made in accordance with Rule 4(h)(1) of the Federal Rules of Civil Procedure.

### B. Trademark Counterfeiting Claim

Section 1114(1)(a) of the Lanham Act establishes a cause of action for trademark counterfeiting, Arcona, Inc. v. Farmacy Beauty, LLC, 976 F.3d 1074, 1078 (9th Cir. 2020); Polo Fashions, Inc. v. Branded Apparel Merch., Inc., 592 F. Supp. 648, 650 (D. Mass. 1984), and the Act defines a counterfeit mark as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark," 15 U.S.C. § 1127. Specifically, the Act "imposes liability on any person who, without authorization, uses a registered trademark 'in commerce' in connection with 'the sale, offering for sale, distribution, or advertising of any goods' in a manner

likely to cause confusion." Luxottica Grp. S.p.A. v. E-Z Telecomm Corp., 839 F. Supp. 3d 23, 30 (D. Mass. 2026) (quoting 15 U.S.C. § 1114(1)(a)).

"To succeed on a claim for trademark counterfeiting and infringement, a plaintiff must prove two elements: (1) the trademarks are entitled to trademark protection, and (2) the allegedly infringing use is likely to cause consumer confusion."[4] Sound United, LLC v. SalusAudio.com, No. 21-cv-12029, 2022 WL 14757794, at *2 (D. Mass. Oct. 25, 2022) (citation modified). With respect to the first element, to demonstrate entitlement to trademark protection, a "plaintiff need only show prima facie evidence of the validity of the trademarks and their exclusive right to use the products in commerce." Id. (citing 15 U.S.C. § 1057(b)). The second element, likelihood of confusion, "ordinarily presents a question of fact evaluated under the First Circuit's familiar multi-factor test—including the similarity of the marks, the similarity of the goods, and evidence of actual confusion," however, "a full factor-by-factor analysis is unnecessary where the challenged marks are counterfeit[,] [b]ecause counterfeit marks are designed to imitate genuine marks and are used on identical or substantially identical goods, [so] a likelihood of confusion is presumed." Luxottica Grp. S.p.A., 839 F. Supp. 3d at 30 (first citing Bos. Athletic Ass'n v. Sullivan, 867 F.2d 22, 29 (1st Cir. 1989); and then citing Copy Cop, Inc. v. Task Printing, Inc., 908 F. Supp. 37, 44 (D. Mass. 1995)).

Here, Plaintiff has asserted trademark counterfeiting of three federally registered trademarks, including the API Starburst and the two versions of the API Donut. [Compl. ¶¶ 32–

---

[4] The Court notes that this Circuit seemingly has not established a clear standard for counterfeit infringement, including whether there needs to be evidence of a likelihood of confusion. That said, at least one other circuit has grappled with the issue and determined that, based on the plain text of § 1114(1)(a), "likely to cause confusion" is a requirement for a counterfeiting claim. Arcona, 976 F.3d at 1078. The Court agrees and sees no reason to depart from the Ninth Circuit's rationale.

38]. Plaintiff has set forth prima facie evidence that it is entitled to trademark protection by asserting that it owns and has registered these marks. [Id.]. Plaintiff has also alleged that the Default Defendants engaged in trademark counterfeiting by using both the actual API Marks on Questron product labels without Plaintiff's authorization and by using "knock-off" marks which were designed to imitate the API Marks. [Id. ¶ 53]. API has sufficiently alleged that the Default Defendants' unauthorized use of the API Marks was intentional and done with the purpose of "deceiving the public and unfairly trading on the goodwill of API and its marks." [Id. ¶ 3]. The Court, therefore, adopts the presumption that the Default Defendants intended to confuse consumers by using the API Marks and similar knock-offs.

**C. Damages**

In its motion for default judgment, API seeks $1,000,000 in statutory damages from the Default Defendants collectively. [ECF No. 124 at 19]. "Under the Lanham Act, a trademark owner may recover statutory damages in lieu of actual damages," Sound United, LLC, 2022 WL 14757794, at *4 (citing 15 U.S.C. § 1117(c)), and "[t]he Court may award statutory damages between $1,000 and $200,000 'per counterfeit mark per type of goods . . . sold . . . as the court considers just' or up to $2,000,000 per counterfeit mark per type of good if the Court finds the use of the mark to have been willful," id. (alteration in original) (quoting 15 U.S.C. § 1117(c)). "The Lanham Act provides 'no guidance as to the determination of statutory damages, leaving the matter to the Court's discretion.'" Id. (quoting CrossFit, Inc. v. Mustapha, 162 F. Supp. 3d 46, 52 (D. Mass. 2016)). When determining the appropriate amount of statutory damages to award, Courts consider several factors:

> (1) the expenses saved and profits reaped by the defendant; (2) the revenues lost by the plaintiff; (3) the value of the [trademark]; (4) the deterrent effect on infringers other than the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether the defendant has cooperated in providing particular records

> from which to assess the value of the infringing material produced; and (7) the potential for deterring the defendant.

Id. (alteration in original) (quoting CrossFit, Inc., 162 F. Supp. 3d at 52). "[W]here the parties have not engaged in discovery and there is little or no evidence of expenses saved, profits reaped, the value of the [marks], and revenues lost, the final four factors weigh heaviest on the Court's decision-making." Id. at *5.

Here, API argues that the Default Defendants' actions were willful and that they are more culpable than the other defendants given that they manufactured and originally sold the counterfeit products, and that because the Default Defendants refused to participate in the litigation, the true magnitude of their counterfeiting activities cannot be known. [ECF No. 124 at 20]. API also contends that $1,000,000 in statutory damages is appropriate and proportional considering that the Default Defendants constitute approximately one-third of the named defendants, from whom API originally requested a total of $6,000,000 in statutory damages. [Id.].

Considering that API is largely unable to estimate the impact of the Default Defendants' wrongful conduct due to their unresponsiveness, the Court finds that API has sufficiently shown that the Default Defendants' actions have led to at least some impairment of API's consumer goodwill. API has also demonstrated that the Default Defendants' counterfeiting activities were willful, for example, where Questron continued to use API Marks and similar images on their product labels even after API had communicated that it was not permitted to do so and after Questron had agreed to destroy all such labels. See [Compl. ¶¶ 57–58, 62, 67]. The Default Defendants have clearly not cooperated in providing records or other discovery to API, and the Court finds that an award of $1,000,000 in statutory damages is appropriate to deter not only the Default Defendants but also others who seek to infringe on API's trademarks in the future.

**D. Injunctive Relief**

Under the Lanham Act, courts have the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." 15 U.S.C. § 1116(a). "Generally, a court may grant an injunction after weighing four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff will suffer irreparable harm in the absence of an injunction; (3) whether the plaintiff's injury outweighs any harm the grant of an injunction would impose on the defendant; and (4) whether an injunction will adversely affect the public interest." Sound United, LLC, 2022 WL 14757794, at *5 (citing Equine Techs., Inc. v. Equitechnology, Inc., 68 F.3d 542, 544 (1st Cir. 1994)). "In trademark infringement cases, the 'key issue is the likelihood of success on the merits because the other decisions will flow from that ruling.'" Id. (quoting Boustany v. Bos. Dental Grp., Inc., 42 F. Supp. 2d 100, 104 (D. Mass. 1999)). "[I]rreparable harm flows from an unlawful trademark infringement as a matter of law," because "the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot adequately be compensated." Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 640 (1st Cir. 1992).

Plaintiff has demonstrated that it is likely to succeed on the merits of its trademark counterfeiting claim, and irreparable harm is therefore presumed. Injunctive relief is also warranted because the potential harm to Plaintiff absent such relief outweighs the harm that the Default Defendants might suffer if an injunction were to be entered, and the public has a strong interest in not being deceived by counterfeit marks or confusing labels on motor oils.

### E. Attorney's Fees

Plaintiff also requests an award of attorney's fees under the Lanham Act, or alternatively, the Massachusetts State Unfair Competition Act. [ECF No. 124 at 23–24]; [Compl. at 39]. "Section 1117(a) of the Lanham Act provides that '[t]he Court in exceptional cases may award reasonable attorneys' fees to the prevailing party.'" Conair Corp. v. Next G, Corp., No. 20-cv-01093, 2023 WL 11824301, at *6 (D.P.R. Mar. 17, 2023) (quoting 15 U.S.C. § 1117(a)). "Exceptional cases are those in which acts of infringement were 'malicious, fraudulent, deliberate, or willful.'" Id. (citation modified) (quoting Tamko Roofing Prods., Inc. v. Ideal Roofing Co., 282 F.3d 23, 31 (1st Cir. 2002)). Courts evaluate the totality of the circumstances to determine whether a case is "exceptional." Id.

Here, the Court finds that an award of attorney's fees is warranted. Based on Plaintiff's allegations, the Default Defendants' actions were clearly deliberate and intended to deceive consumers into believing that their products met certain quality standards when they did not. Further, at least Questron and its associated individuals lied to Plaintiff on multiple occasions regarding whether any of the Questron labels still included improper API Marks or similar depictions and whether the improper labels had been destroyed. Plaintiff also alleges that America Petro continues to advertise products with counterfeit API Marks on its website and/or Facebook page. [Compl. 77]; [ECF No. 1-22]. Additionally, despite being served and having what appear to be connections with the other defendants, the Default Defendants have failed to appear and defend this action at any point over the three years since the Complaint was filed.

Accordingly, under the totality of the circumstances, Plaintiff's request for reasonable attorney's fees under the Lanham Act is **GRANTED**.[5]

## III. CONCLUSION

For the foregoing reasons, Plaintiff's motion for default judgment, [ECF No. 123], is **GRANTED**. Statutory damages in the amount of $1,000,000 and reasonable attorney's fees are awarded against the Default Defendants jointly and severally. Within fourteen days of this order, Plaintiff shall submit appropriate documentation establishing the amount of reasonable attorney's fees it has expended in connection with its trademark counterfeiting claim against the Default Defendants. The Default Defendants, including the officers, agents, servants, employees, and any persons or entities acting in concert or participation with the Default Defendants are hereby **ENJOINED** from (1) using API Marks, or any confusingly similar or colorable imitations thereof, on any of their labels, packaging, promotional materials, advertising, or web sites; (2) making any claims to have met the API "SN" category, or any other API service category, without having valid tests to prove that their products actually meet the corresponding service category; or (3) making any claims or references to having obtained or otherwise met any other API certification standards or endorsement without having valid tests to prove that their products actually meet such standards.

**SO ORDERED.**

November 2, 2026

*/s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

[5] The Court need not reach Plaintiff's request for attorney's fees under the Massachusetts State Unfair Competition Act.